**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SHERRAI GENEVA PEPPERS, | ) CASE NO. 3:17-cv-00920 |
| Plaintiff, | ) |
| v. | ) MAGISTRATE JUDGE DAVID A. RUIZ |
| NANCY A. BERRYHILL, *Acting Comm'r of Soc. Sec.*, | ) **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) |

Plaintiff, Sherrai Geneva Peppers (hereinafter "Plaintiff"), challenges the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter "Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the Commissioner's final decision is ordered REVERSED and REMANDED for proceedings consistent with this opinion.

**I. Procedural History**

On August 20, 2014, Plaintiff filed her applications for POD, DIB, and SSI, alleging a disability onset date of January 2, 2010. (Transcript ("Tr.") 264-278). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ"). (Tr. 129-219). Plaintiff participated in the hearing on November 18, 2015, was represented by counsel, and testified. (Tr. 41-79). A vocational expert ("VE") also participated and testified. *Id*. On February 2, 2016, the ALJ found Plaintiff not disabled. (Tr. 24-39). On March 8, 2017, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-7). On May 1, 2017, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 10, 11, 12).

Plaintiff asserts the following assignments of error: (1) the ALJ erred in her evaluation of the opinion of Plaintiff's treating physician, and (2) the ALJ erred in assessing the credibility of Plaintiff's alleged symptoms. (R. 10).

## II. Evidence

### A. Relevant Medical Evidence[1]

#### 1. Treatment Records

On October 29, 2013, Plaintiff was seen by Noor Pirzada, M.D., for a neurological examination. (Tr. 391-393). Dr. Pirzada noted that Plaintiff's reported pain two years earlier had initially been mild, but that Plaintiff reported "progressively more severe and persistent" pain that affected sleep and sometimes walking. (Tr. 391). Plaintiff also complained of numbness and tingling in her extremities, but she had no history of weakness in the arms or legs. *Id*. An MRI was unremarkable. *Id*.

On December 9, 2013, Plaintiff reported pain in her lower back when walking and Dr.

---

[1] The recitation of the medical evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised and focuses largely on the treatment of physician John Jacob, M.D.

2

Pirzada increased her gabapentin dosage (Tr. 389). Dr. Pirzada noted that "[a]n EMG and nerve conduction study was normal but it is possible that her symptoms may be related to a small fiber diabetic neuropathy where conventional nerve conduction studies may be normal." *Id*. Dr. Pirzada's nurse noted that Plaintiff had impaired mobility, weakness or unsteady gait and was at risk for falls. (Tr. 388).

On November 25, 2013, Plaintiff presented to the emergency room complaining about right foot pain and asthma. (Tr. 863). She had a steady gait, maintained normal range of motion and strength, but swelling of the right foot and tenderness were noted. *Id*.

On April 9, 2014, Dr. Pirzada again saw Plaintiff. (Tr. 381-386). Dr. Pirzada assessed chronic small fiber diabetic neuropathy, not controlled; diabetes mellitus type II, chronic but controlled; and chronic pain, not controlled. (Tr. 385). On examination, Plaintiff's gait was normal; heel walking, toe walking, and tandem gait were abnormal. *Id*.

On May 14, 2014, Plaintiff reported worsening symptoms of asthma to John Jacob, M.D. (Tr. 409-413). She was assessed with fibromyalgia, asthma, and anemia of chronic disease. (Tr. 412). Dr. Jacob prescribed Tylenol, Prednisone, and a nebulizer (Tr. 413).

On May 30, 2014, Plaintiff was seen for follow up of an established diagnosis, test results, and hand pain. (Tr. 404). She was unable to obtain a new prescription due to insurance coverage issues. *Id*. Dr. Jacob noted that Plaintiff did not maintain a healthy diet or exercise, and weighed 244 pounds with a 41.88 BMI. (Tr. 404, 406). Upon examination, Plaintiff had trigger point pain (Tr. 407). Her asthma was noted to be improving, conversely her fibromyalgia pain control was deteriorating and her prescription for Gabapentin was increased. (Tr. 407).

On July 2, 2014, neurological examination revealed Plaintiff's mental functions were within normal limits, no weakness of the jaw or neck, normal shoulder shrug strength, normal

bulk and tone in the extremities with 4+ strength, and deep tendon reflexes are 1+ with "symmetric plantars downgoing." (Tr. 379). Plaintiff complained of pain in the low back while walking. *Id*. She had exaggerated lumbar lordosis, but no paraspinal muscle spasm. *Id*.

On November 3, 2014, Plaintiff was seen by Dr. Jacob for follow up after an ER visit where she complained of neck and back pain. (Tr. 732). She was out of pain medication and her score on a depression questionnaire revealed severe depression (Tr. 732). Dr. Jacob diagnosed neck pain of undetermined etiology, and noted Plaintiff's pain control has been inadequate. (Tr. 736). The treatment/diagnostic plan included neck x-rays, medication management including continuing nonsteroidal anti-inflammatory drugs, continuing muscle relaxants and beginning corticosteroids, and physical therapy. *Id*.

On December 1, 2014, Plaintiff complained to Dr. Pirzada about pain in her neck, back, shoulder, and arm. (Tr. 757). Plaintiff reported that she received "some relief" from Gabapentin, but continued to have episodes of breakthrough pain. (Tr. 758). An MRI of the cervical spine was ordered, and Plaintiff was referred to the pain clinic for pain control. (Tr. 760).

On December 2, 2014, Plaintiff was seen by Dr. Jacob secondary to an ankle sprain one month earlier, which she felt was not improving. (Tr. 723). Dr. Jacob noted an antalgic gate and indicated "the patient requires the use of a cane." (Tr. 725). Dr. Jacob's impression was left foot pain moderate in severity. (Tr. 726). The treatment plan included non-steroidal anti-inflammatory drugs, a compression bandage, splint, cane, and referral to an orthopedist. (Tr. 726).

On January 2, 2015, Plaintiff again saw Dr. Jacob, who diagnosed acute bronchitis, pre-diabetes, and peripheral neuropathy. (Tr. 721).

On January 17, 2015, Plaintiff was seen by Joseph Atallah, M.D., upon referral from Dr.

4

Pirzada. (Tr. 752). Dr. Atallah diagnosed chronic neck and facet joint pain, uncontrolled. (Tr. 756). Examination of Plaintiff's upper extremities yielded unremarkable results. (Tr. 755). Imaging studies were also unremarkable. (Tr. 755-756). He referred Plaintiff for six weeks of physical therapy; following that treatment, she was to return to the clinic for further evaluation. (Tr. 756).

On January 22, 2015, during physical therapy Plaintiff complained of lower extremity pain, "yet [was] able to lift LE to almost full ROM with hamstring stretching. L cervical spine is restricted and mm are in mild spasm." (Tr. 770). Following the first therapy session, Plaintiff reported pain at a level 3 out of 10 on the pain scale (Tr. 770).

Between January 26 and January 29, 2015, Plaintiff was hospitalized for chest pain. (Tr. 778). The discharge diagnosis indicated that Plaintiff's chest pain was "noncardiac and was likely musculoskeletal versus anxiety related." *Id*.

On April 20, 2015, Dr. Jacob saw Plaintiff for a post-ER visit secondary to a left knee injury sustained two weeks earlier, but which yielded no broken bones. (Tr. 937). On musculoskeletal examination, Dr. Jacob noted Plaintiff had a slight limp, but no mobility limitations with full weight bearing status bilaterally. (Tr. 940). Range of motion and strength were also normal bilaterally. *Id*. Dr. Jacob assessed her with internal derangement of the knee and prescribed pain medication and physical therapy (Tr. 940). Plaintiff was instructed to avoid lifting and performing manual work or exercise for three weeks. *Id*.

On April 22, 2015, Plaintiff returned to physical therapy to address her left knee and ankle pain. (Tr. 956-987). She reported that she required the assistance of her children to complete activities of daily living due to neck, back and left lower extremity pain. (Tr. 956). Plaintiff attended six sessions, and "made slight improvements in strength but no improvement in

subjective reports of function or pain level." (Tr. 985). The physical therapist believed Plaintiff's condition could improve within a "reasonable/predictable" time. (Tr. 985).

On June 24, 2015, Dr. Jacob noted that Plaintiff was asymptomatic but had worsening eating habits, fatigue, back pain, and joint pain. (Tr. 948). Plaintiff had an antalgic gait and was partial weight-bearing status on the left and right. (Tr. 951). Both flexion and extension on active range was painful. *Id*.

On July 15, 2015, Plaintiff reported neck, shoulder, and arm pain to Dr. Atallah. (Tr. 1046). Neurological examination of the right arm was normal; on the left side, Plaintiff had "C5 decreased sensation of the outer upper arm, C6 decreased sensation of the radial forearm, thumb, and index finger, and C7 decreased sensation of the middle finger and CB normal and T1 normal." (Tr. 1049). Dr. Atallah assessed Plaintiff with cervical radiculopathy and ordered an EMG (Tr. 1050), which showed no evidence of peripheral neuropathy in the arms and legs, but he noted "her symptoms could be secondary to small fiber neuropathy from diabetes where the EMG and nerve conduction study can be normal." (Tr. 1052).

On August 5, 2015, examination by C. Weuscher, M.D., revealed "patient has no definite muscle atrophy. She has decreased sensation subjectively over the superficial radial nerve distribution. Grip strength in essentially all muscles tested on the left showed weakness at 4 out of 5 but this appeared to be more consistent with giveaway weakness." (Tr. 1044). Plaintiff reported left hand and arm pain that worsened with activity. (Tr. 1044).

On September 9, 2015, Dr. Atallah observed that Plaintiff's type of left arm pain was not consistent with the EMG and MRI. (Tr. 1041). He stated that her "pain could be related to a thoracic outlet syndrome" and referred Plaintiff to a vascular surgeon. *Id*.

**2. Medical Opinions Concerning Plaintiff's Functional Limitations**

On October 14, 2014, state agency physician Venkatachala Sreenivas, M.D., reviewed the evidence of record and opined that Plaintiff, in an 8-hour workday, could lift/carry twenty pounds occasionally and ten pounds frequently, stand/walk for six hours, sit for six hours, could never climb ladders/ropes/scaffolds, could occasionally crawl, and needed to avoid concentrated exposure to extreme temperatures, humidity, hazards, and irritants. (Tr. 135-137)

On February 19, 2015, state agency physician Paul Morton, M.D., reviewed the evidence of record and opined that Plaintiff, in an 8-hour workday, could: lift/carry twenty pounds occasionally and ten pounds frequently; stand/walk for six hours and sit for six hours; could never climb ladders/ropes/scaffolds; could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and, needed to avoid concentrated exposure to extreme temperatures, wetness, humidity, hazards, and irritants. (Tr. 166-168).

On March 19, 2015, Dr. Jacob completed a checklist medical source statement concerning Plaintiff's physical abilities and limitations. (Tr. 867-869). He opined that during an 8-hour workday, Plaintiff could stand/walk for a total of two hours in thirty minute increments; sit for sixty minutes total in fifteen minute increments; and needed a sit/stand option. (Tr. 867). He further indicated that Plaintiff would need to lie down for one hour and elevate her legs for one hour during the workday. *Id*. Plaintiff could lift /carry only five pounds both frequently and occasionally, as well as occasionally reach, handle, and finger with both upper extremities. *Id*. Dr. Jacob noted Plaintiff did not use an assistive device for ambulation, had moderate levels of pain, but noted that objective evidence would not reasonably be expected to cause this degree of pain. (Tr. 868). Her prescription for Gabapentin may cause dizziness. *Id*. In the comments, Dr. Jacob indicated that Plaintiff had poorly controlled fibromyalgia, back pain, and a stress fracture that, if not properly treated, could progress to a full fracture. *Id*. He opined that Plaintiff's

7

"current condition is affecting activities of daily living and work performance." *Id*.

On June 24, 2015, Dr. Jacob wrote a letter not addressed to anyone indicating that Plaintiff "has been under my care for the past 3 years and I feel under my professional opinion that she will not be able to work for the next 6 months due to uncontrolled moderate persistant [sic] asthma, left knee pain that she will soon be undergoing surgery for and uncontrolled fibromyalgia." (Tr. 870).

**B. Hearing Testimony**[2]

At the hearing, the ALJ posed the following hypothetical to the VE:

So let's assume a hypothetical individual of the Claimant's age and education with that past relevant work. Let's further assume, the individual is limited to light exertion. The individual can frequently balance, but on [sic] occasionally kneel, stoop, crouch, crawl, and climb ramps and stairs. She may not climb ladders, ropes or scaffolds, and should avoid workplace hazards, such as unprotected heights and dangerous moving machinery. The individual can frequently reach, handle, and finger with the bilateral upper extremities, and frequently push, pull, and operate foot controls with the bilateral lower extremities. She should avoid concentrated exposure to extreme temperatures, wetness, humidity, and respiratory irritants, including dust, fumes, odors, gasses, and areas of poor ventilation. The individual is limited to understanding, remembering, and carrying out simple, routine, and repetitive tasks.

(Tr. 73-74).

The VE testified that such an individual would be unable to perform any of Plaintiff's past relevant work due to the skill and exertion level. (Tr. 74). However, the VE identified the following unskilled jobs that such an individual could perform: sorter, unskilled, light, Dictionary of Occupational Titles ("DOT") 529.687-186 (285,000 jobs nationally); hand packager, DOT 922.687-010 (320,000 jobs nationally); and, inspector, DOT of 727.687-066

---

[2] The court foregoes a summary of the Plaintiff's hearing testimony and focuses on the testimony of the VE. While Plaintiff has challenged the ALJ's determination that she is only partially credible, the court finds the first assignment of error dispositive.

8

(220,000 jobs nationally). (Tr. 74-75). The VE testified that the use of a cane would preclude light jobs that include a limitation to simple, repetitive tasks. (Tr. 75).

The ALJ posed a second hypothetical incorporating the same limitations as the first, but limiting said individual to sedentary work. (Tr. 75). The VE identified the following unskilled jobs that such an individual could perform: sorter, DOT 521.687-086 (190,000 jobs nationally); hand packager/bench hand packager, DOT 715.684-026 (185,000 jobs nationally); and inspector, DOT 726.687-030 (165,000 jobs nationally). *Id*.

The ALJ posed a third hypothetical specifically incorporating the limitations from Dr. Jacob's medical source statement in Exhibit 11F, stating:

> Next hypothetical is from 11F. What if the individual were limited to sedentary work, with occasional use of the bilateral hands, lifting and carrying five pounds — less than five pounds, the need to lie down one hour in an eight hour workday, elevate the legs one hour of an eight hour workday, sit for 15 minutes at a time, for a total of one hour of an eight hour workday, and stand and or walk for 30 minutes for a total of two hours in an eight hour workday.

(Tr. 75-76).

The VE testified that such an individual was unemployable. (Tr. 76). The VE indicated that the inability to work for 8 hours would preclude full-time employment, that an individual would not be permitted to lie down throughout the regular workday, and that elevating the legs at hip height was not permissible. (Tr. 76).

Plaintiff's counsel inquired about the impact of the limitations that Plaintiff could only occasionally use her upper extremities for handling and fingering as found by Dr. Jacob. (Tr. 77). The VE testified that "given the totality of the hypothetical, an individual limited to simple repetitive tasks, with the inability to use upper extremities on a frequent basis, would eliminate all work" at both the light and sedentary levels. (Tr. 77).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the

national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

2. The claimant has not engaged in substantial gainful activity since September 24, 2013, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: coronary artery disease (CAD), cardiomyopathy, hypertension, hyperlipidemia, diabetes mellitus, cervical degenerative disc disease with radiculopathy, osteochondritis dissecans of the left ankle, asthma, fibromyalgia, small fiber neuropathy, obesity, and dysthymic disorder. (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant can frequently balance, but only occasionally kneel, stoop, crouch, crawl, and climb ramps and stairs. She may not climb ladders, ropes, or scaffolds, and should avoid workplace hazards such as unprotected heights and dangerous, moving machinery. The claimant can frequently reach, handle and finger with the bilateral upper extremities, and can frequently push, pull, and operate foot controls with the bilateral lower extremities. She should avoid concentrated exposure to extreme temperatures, wetness, humidity, and respiratory irritants including dusts, fumes, odors, gases, and areas of poor ventilation. The claimant is limited to understanding, remembering, and carrying out simple, routine and repetitive tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on *** 1969 and was 44 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 24, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-34).

### V. Law and Analysis

**A. Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id*.) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ

failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B. Plaintiff's Assignments of Error**

**1. Weight Assigned to Treating Physician's Opinion**

Plaintiff's first assignment of error asserts that the ALJ erred by rejecting the opinions of one of her treating physicians, Dr. Jacob, as set forth in a March 2015 medical source questionnaire. (R. 10, PageID# 1217-1221). The Commissioner does not challenge the assertion that Dr. Jacob was a treating source at the time the March 2015 questionnaire was completed. (R. 11, PageID# 1246-1248). The Commissioner, however, argues that the ALJ reasonably and properly weighed Dr. Jacob's opinion. *Id*.

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give good reasons for doing so that are "sufficiently

13

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5). The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); *see also Johnson v. Comm'r of Soc. Sec.*, 193 F. Supp. 3d 836, 846 (N.D. Ohio 2016) ("The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.") (Polster, J.)

It is well-established that administrative law judges may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009). If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v.*

14

*Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

After summarizing Dr. Jacob's opinions, the ALJ addressed them as follows:

> [Dr. Jacob's] opinions are given little weight and not controlling weight pursuant to SSR 96-2p. Dr. Jacobs's function-by-function opinion is extreme and not supported by the evidence. The claimant's gait is largely normal, her right dominant right extremity is mostly unaffected, and objective testing such as imaging and nerve conduction studies were unremarkable. The undersigned also notes that this opinion is internally inconsistent: Dr. Jacobs opined that the claimant could stand/walk for two hours total, sit for one hour total, would need to elevate her legs for one hour total, and would need to lie down one hour in an eight hour work day. These sum up to less than eight hours, which tends to suggest that this opinion is too extreme.

(Tr. 29).

The parties' briefs, as well as the above cited portion of the decision, focus a great deal on Plaintiff's gait and ambulatory abilities. Dr. Jacob, however, opined that Plaintiff could stand/walk for a total of two hours in an 8-hour workday in thirty minute increments. (Tr. 867). In addition, the ALJ limited Plaintiff to sedentary work (Tr. 26), which requires no more than two hours of standing/walking in a workday.

> 1. *Sedentary work*. The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, **a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met**. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, **periods of standing or walking should generally total no more than about 2**

15

> **hours of an 8-hour workday**, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

Social Security Ruling ("SSR") 83-10, 1983 WL 31251 at * 5 (1983) (emphasis added).

Therefore, in this court's view, the RFC for sedentary work incorporates Dr. Jacob's standing/walking limitation. Nevertheless, that does not end the matter. There are several inconsistencies between the RFC and Dr. Jacob's opinion: (1) sedentary work requires six hours of sitting while Dr. Jacob's opined Plaintiff could sit for no more than one hour total; (2) the RFC does not incorporate Dr. Jacob's opinion that Plaintiff needs to elevate her legs and lie down for one hour each during the workday; (3) Dr. Jacob's restriction to five pounds of lifting is less than the ten pounds associated with sedentary work; and (4) the RFC allows Plaintiff to perform frequent reaching, handling, and fingering with the upper extremities while Dr. Jacob's opinion limited Plaintiff to only occasional reaching, handling, and fingering.[3] (Tr. 26, 867, Exh. 11F).

The ALJ was not required to accept the limitations assessed by Dr. Jacob, but the ALJ's decisions must set forth good reasons for rejecting these opinions. The ALJ's characterization of the opinion as "extreme and not supported by the evidence" is a conclusion that, on its own fails to satisfy the treating physician rule. The ALJ further asserts that Plaintiff's "dominant right extremity is mostly unaffected, and objective testing such as imaging and nerve conduction

---

[3] Significantly, as set forth *supra*, the VE testified that an individual limited to simple repetitive tasks must be able to use her upper extremities on a frequent basis, otherwise all work is eliminated at both the light and sedentary levels. (Tr. 77). The RFC limited Plaintiff to simple, routine, and repetitive tasks. (Tr. 26). Therefore, the limitation to occasional use of the upper extremities would be work preclusive if credited.

studies were unremarkable." This statement too is conclusory, though other portions of the decision do identify evidence showing full strength in Plaintiff's right extremity. (Tr. 27, 28).

But even if the court were to consider this explanation as satisfying the good reasons requirement with respect to the right upper extremity, the ALJ does not explain why the decision rejected Dr. Jacob's limitation to occasional use of the upper left extremity. Further, the ALJ's decision notes in three separate references that claimant complained of "left sided weakness," had "decreased strength and sensation in her left upper extremity," and had "decreased left upper extremity strength." (Tr. 27, 28). While the court has no opinion as to whether these cited records justify a restriction to only occasional use of the left upper extremity, the ALJ's failure to address the issue violates the treating physician rule, especially where the VE has testified that the frequent use of the upper extremities is essentially dispositive.

Finally, in the section addressing Dr. Jacob's opinion, the ALJ did not specifically address the weight ascribed to the sitting limitations assessed, the need to lie down, or the need to raise her legs for an hour — all work preclusive limitations according to the VE's testimony. In other portions of the decision, however, the ALJ indicates that "there is little evidence that the claimant is unable to sit for long periods" and that "there is no evidence that the claimant is unable to sit for the majority of an eight-hour workday." (Tr. 27, 30). Plaintiff has not contradicted these assertions with evidence of record. When reading the opinion as a whole, the ALJ gave sufficient reasons for not crediting the sitting restriction. The other limitations, however, remained unaddressed.

Although the ALJ may reasonably have concluded that the limitations assessed by Dr. Jacob were not supported by his own treatment notes or other doctors in the record, the ALJ does not point to inconsistencies between Dr. Jacob's medical source statement and treatment notes or

17

other opinions, nor does the ALJ provide an explanation for such a conclusion.[4] Courts routinely find that perfunctory assessments of treating source opinions do not constitute "good reasons" for their rejection. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245-46 (6th Cir. 2007) (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely concluded, without explanation, that the evidence of record did not support the severity of the assessed limitations); *Patterson v. Astrue*, 2010 WL 2232309 at *14 (N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance.") (Vecchiarelli, M.J.); *Fuston v. Comm'r of Soc. Sec.*, No. 1:11-CV-224, 2012 WL 1413097 at *9 (S.D. Ohio Apr. 23, 2012), *report and recommendation adopted*, 2012 WL 1831578 (S.D. Ohio May 18, 2012) ("To facilitate meaningful judicial review the ALJ must state the evidence considered which supports his conclusion.")

The ALJ's decision did not articulate good reasons for discounting the treating physician opinions. The court finds merit in Plaintiff's first assignment of error and orders that a new decision be issued that sufficiently explains the weight assigned to the opinions of Plaintiff's treating sources. Because the court finds the first issue dispositive, it need not consider whether the ALJ's decision contains a deficient credibility analysis as argued by Plaintiff in the second assignment of error.

## VI. Conclusion

---

[4] This opinion should not be construed as suggesting that Dr. Jacob's medical source statement should be ascribed any particular level of weight. It is admittedly contained in a checkbox format with limited explanation. (Tr. 867-869). However, the ALJ does not discuss how the evidence fails to support the opinion in question.

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED to defendant for further proceedings consistent with this opinion.

                                                  s/ *David A. Ruiz*
                                                  David A. Ruiz
                                                  United States Magistrate Judge

Date: August 29, 2018